Gary HAKE, Plaintiff,

v.

EAGLE PICHER COMPANY, Defendant and Third-Party Plaintiff,

v.

HARDWARE MUTUAL CASUALTY COMPANY, Third-Party Defendant, and Third-Party Plaintiff,

v.

GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION, Ltd., Third-Party Defendant.

Civ. No. 3640.

United States District Court
W. D. Wisconsin.

Nov. 17, 1966.

W. L. Jackman and M. W. Bieber, Madison, Wis., for Gary Hake.

Eugene O. Gehl, Madison, Wis., for Eagle Picher and General Accident Fire and Life Assurance Corp.

John Jenswold, Madison, Wis., for Eagle Picher Co.

O. G. Hamilton, Madison, Wis., for Hardware Mutual Casualty Co.

## ORDER

JAMES E. DOYLE, District Judge.

Eagle Picher Company, as defendant and third-party plaintiff, has moved for summary judgment in its favor and against third-party defendant Hardware Mutual Casualty Company.

The plaintiff Hake's amended complaint herein names Eagle Picher as defendant. Hake alleges that Eagle Picher "had engaged the use of trucks with drivers from Gensler Brothers, by whom plaintiff was employed," for the purpose of raising the height of a certain dam or embankment situated on Eagle Picher's premises; and "that the method of raising said dam adopted and directed by [Eagle Picher] was to have the truck driven by plaintiff loaded on its [Eagle Picher's] premises near said dam and to require that the truck be backed along the top of the dam to the place where the earth was to be deposited on the dam and there dump the earth on the dam." The complaint alleges "that while plaintiff was engaged in backing the loaded truck along the top of the dam, the truck and plaintiff fell off the edge of the dam * * *, the truck rolled on or struck plaintiff * * *." The complaint alleges, further, that the accident and injury were proximately caused by the negligence of plaintiff Eagle Picher: "In failing to furnish a place of employment as free from danger * * * as the nature of the place and the operations thereof would reasonably permit; in failing to furnish safety devices and safeguards; in failing to adopt methods and processes reasonably adequate to render such * * * place of employment safe; in failing to do every other thing reasonably necessary to protect the life, health, safety and welfare of employees and frequenters; in failing, as an employer and owner of the premises to construct, maintain and repair said dam as to render the same safe."

The complaint alleges the respects in which defendant Eagle Picher had failed to make the place safe: no barricades or railings were installed to prevent vehicles from moving to the edge of the dam; instead of crushed rock, the dam was being constructed of loose dirt, without a binder; the roadway on the dam was not sufficiently compacted; no watchman guided the trucks in their backward movement; no guideposts were installed.

The complaint also alleges the respects in which defendant Eagle Picher's methods and processes were unsafe: failure to move the dirt onto the dam by end loader or other vehicle which would permit the driver to observe the path to be taken; failure to move the dirt onto the dam by dredge or conveyor belt or rail, or other means other than motor vehicle; failure to process the dirt to make it pack solidly for entire width of dam, and failure to pack the dirt and to make a stable roadway; permitting and directing the transportation of the dirt to the top of the dam by truck, and providing no way for the truck to move onto the dam except by backing.

Eagle Picher's third-party complaint against Hardware Mutual Casualty Co. alleges that at the time of the accident there was in force a Hardware automobile liability policy issued to Gensler Bros., and that the term "insured" was defined in the policy to include "any person while using the truck * * *, provided the actual use of the truck was by the named insured or with the permission thereof"; that the alleged accident and injuries "arose out of and were caused by the use of the said truck"; that the truck "was being used by defendant [Eagle Picher] within the meaning of said policy"; that the described use of the truck by defendant Eagle Picher was with the permission of the named insured (Gensler); that Eagle Picher is an insured under the policy; that Hardware is required to de-

fend Eagle Picher in the action and to pay the costs of such defense; "that if it is determined that defendant [Eagle Picher] sustains liability to the plaintiff [Hake], [Hardware] will be obligated to pay any judgment entered against defendant [Eagle Picher] in favor of the plaintiff." The third-party complaint alleges that the defense of the action had been tendered by Eagle Picher to Hardware, but that Hardware had neglected, refused and failed to undertake the defense.

The prayer of the third-party complaint is that if it is determined that the defendant Eagle Picher is liable to the plaintiff Hake, then third-party defendant Hardware should be required to satisfy the judgment against Eagle Picher or to reimburse Eagle Picher for the amount of said judgment, and that Eagle Picher should be reimbursed for costs and expenses incurred in the defense of Hake's action. Eagle Picher's present motion is for summary judgment granting the relief prayed for in its third-party complaint.

The motor vehicle liability policy issued by Hardware to Gensler Brothers includes a provision that it will pay "on behalf of the insured" sums for which the insured may become liable because of injuries caused by accident "and arising out of the ownership, maintenance or use of the automobile." The Hardware policy also contains the following clause:

"Definition of Insured. (a) With repect to the insurance for bodily injury liability * * * the unqualified word 'insured' includes the named insured * * * and also includes any person while using the automobile * * *, provided the actual use of the automobile is by the named insured * * * or with the permission [of the named insured]."

At the time of the accident in question, there was in force a so-called "combined comprehensive liability policy" which had been issued to Eagle Picher by General Accident Fire and Life Assurance Corporation. The General Accident comprehensive liability policy issued to Eagle

Picher contains a so-called "excess coverage" clause. The Hardware motor vehicle liability policy issued to Gensler Brothers contains a so-called "pro rata coverage" clause. If Eagle Picher is not an additional insured under the omnibus clause of the Hardware policy, this phase of the lawsuit is determined. If Eagle Picher is an additional insured under the omnibus clause of the Hardware policy, then the relative priority of the Hardware and General Accident coverages must be determined; Eagle Picher contends that Hardware's coverage is primary, and that General Accident's coverage begins only where Hardware's ends. Counsel for General Accident has agreed in open court that General Accident will be bound by the determination of this present motion by Eagle Picher for summary judgment.

Two central questions are raised by Eagle Picher's motion for summary judgment: (1) whether the injury sustained by plaintiff Hake was one "arising out of the * * * use" of the insured dump truck at the time and place of the accident, within the meaning of the Hardware policy; and (2) whether at the time and place of the accident Eagle Picher was "any person while using the [truck]," within the meaning of the definition of an additional insured in the Hardware policy. Question (1) may be said to relate to covered "uses," and question (2) to covered "users," under the Hardware policy.

### "USES"

Much of the authority cited by both parties relates to whether there is policy coverage of "uses" other than the operation or "driving" of a vehicle in order to move it from one point to another. There is no doubt, from the case law, that "use" may cover more than this type of operation: for example, use of the vehicle by one riding in it as a passenger, Maurer v. Fesing, 233 Wis. 565, 570–571, 290 N.W. 191 (1940); use by one loading it or unloading it, even when the policy does not contain a clause defining "use" to include "loading and unloading," Travelers Insurance Co. v. American Fidelity

& Cas. Co., 164 F.Supp. 393 (D.Minn. 1958); and even use by one steadying his rifle on its top while firing at deer, Fidelity and Casualty Company of New York v. Lott, 273 F.2d 500 (C.A.5th, 1960). We need not concern ourselves with such uses; the use of the dump truck in this case is in the mainstream of normal and expected uses. It was being used for its normal and expected purpose: it had been loaded with clay and soil and it was carrying this load the short distance to the point at which it was to be dumped. Eagle Picher contends that the truck was also being used to compact the clay and soil scattered onto either the old top surface of the dam, or the clay and soil recently dumped along the east edge of the old top surface in the widening process, or the clay and soil on both the old and the added top surfaces. This contention is partially disputed. However, even if this one aspect is considered to be in dispute, the pleadings, depositions, and affidavits show that there is no genuine issue as to the material fact that the dump truck was being used to carry clay and soil from the point of loading to the point of unloading. This was clearly a use covered by the policy.

### "USERS"

■ Although the truck clearly was being "used" within the meaning of the Hardware policy, and although the named insured Gensler Brothers and their employee Hake clearly were so "using" it, was Eagle Picher also a "person while using the [truck]"? If so, then Eagle Picher was an additional insured under the omnibus clause of the Hardware policy.

With respect to this question, there appears to be no genuine issue as to the following material facts: Eagle Picher desired to increase the height of an earthen dam on its premises; before its height could be increased, the top surface of the dam had to be increased from a width of about 10 feet to about 14 feet; Eagle Picher entered into an oral contract with Gensler Brothers by which Gensler fur-

nished dump trucks and drivers to perform the trucking phase of the project; a "front end loader" owned by Eagle Picher and operated by its employee Tony Graham dug clay and soil from a nearby hillside and loaded it into the Gensler dump trucks; the dump trucks backed up on to the top surface of the dam, moved to the next spot at which the widening was required, dumped the loads, and returned to the point at which the front end loader was stationed. At frequent intervals Tony Graham would move the front end loader onto the top surface of the dam, spread the freshly dumped clay and soil, move along the surface of the newly added portion to compact it, and occasionally level out areas on the surface of the old portion of the dam. During this operation, plaintiff Hake, a Gensler driver, was backing a loaded Gensler truck along the surface of the old portion of the dam when the truck fell off the edge and Hake was injured.

Thus Eagle Picher was a "user" of the Gensler dump trucks in the sense that the function performed by the dump trucks was providing a benefit to Eagle Picher, in the sense that the trucks were being employed in the service of Eagle Picher, and in the sense that the trucks were serving some purpose or objective or end desired by Eagle Picher. Also, the dump trucks were engaged in a project in which their function was physically and closely synchronized with a function being performed directly by Eagle Picher, namely, the digging, loading, spreading, compacting, and scraping performed by the front end loader operated by Tony Graham.

Eagle Picher contends that there is no genuine issue as to a further material fact: that Eagle Picher exercised job site control over the Gensler vehicles. Eagle Picher relies upon the deposition of Cyril Burke, who drove one of the dump trucks on the project as a Gensler employee. Burke's testimony is that Eagle Picher's employee, Tony Graham, gave Burke detailed instructions at the job site that he was to back his truck

from the loading point up on to the top surface of the dam, that he was to dump the loads at certain places and in a certain pattern, and that he was to notify Graham when it was time for Graham to go on to the dam with his front end loader to scrape the clay and soil (Burke deposition, pp. 7–8, 31). Burke's testimony, however, is contradicted by the testimony of Eagle Picher's witnesses, Harold H. Haman and Tony R. Graham. Haman, Eagle Picher's general superintendent for its Illinois-Wisconsin operations, testified in his deposition: that he was present at the job site as an observer only once or twice for 15–20 minutes; that he had given general instructions to one of the Gensler brothers at the time the oral job contract was entered into; that the Gensler truck drivers were "definitely not" "subject to the instructions and supervisions of [Eagle Picher] employees on these jobs"; that Haman had not told Gensler that the trucks "would have to back out onto the top of the dam"; and that: "We had given the job to Gaensler. We had agreed to load his trucks for him and throughout—in all our relations with him or other contractors, we have deliberately avoided giving any instructions to employees that are not ours." (Haman deposition, pp. 13, 17, 18, 19, 20.) Tony Graham testified in his deposition: that he had nothing to do with the Gensler trucks; that he had not told the Gensler truck drivers where to start dumping the fill; and that he had not tried to show them where to dump it (Graham deposition, pp. 14, 16, 18). It is true that neither the Haman nor the Graham deposition is wholly consistent in this respect. However, the conclusion cannot be escaped that there is a genuine issue whether Eagle Picher exercised job site control over the Gensler trucks and drivers. For purposes of the Eagle Picher motion for summary judgment, therefore, this factor must be disregarded.

Therefore, we are required to determine whether Eagle Picher is a "user," within the meaning of Gensler's automobile liability policy, when it contracts with Gensler to provide Gensler's trucks and drivers to perform the dump truck function of loading, transporting, and dumping, on a construction project in which Eagle Picher's front end loader and its operator are to perform a synchronized function of digging, loading, spreading, compacting, and scraping.

Wisconsin decisions, by which we would be bound in this diversity case, help us little. Thus, on the one hand, they suggest a liberal construction of the concept of use (riding in an automobile on a pleasure trip is a use, Maurer v. Fesing, 233 Wis. 565, 570–571, 290 N.W. 191 (1940); Schimke v. Mutual Automobile Ins. Co., 266 Wis. 517, 522–523, 64 N.W. 2d 195 (1954); Prisuda v. General Casualty Co., 272 Wis. 41, 48–49, 74 N.W.2d 777 (1956)), and, on the other, a strict construction (the inclusion in a policy of the words "including the loading and unloading thereof" is an "extension of the use clause," Ermis v. Federal Windows Mfg. Co., 7 Wis.2d 549, 553, 97 N.W.2d 485, 486 (1959)). *Ermis,* it is true, is authority for the proposition that when "use" includes loading a vehicle (the policy expressly so provided), and a person other than the named insured is engaged in loading the vehicle, said person may be a user, and may thus become an additional insured. *Ermis* cites favorably the decision of the court to this effect in Bituminous Casualty Corp. v. Travelers Ins. Co., 122 F.Supp. 197 (D.Minn.1954). Both *Ermis* and *Bituminous,* however, involved the contention that the physical use of the truck (to wit, the loading of it) was being performed directly by the person claiming to be the additional insured. They do not reach the issue raised by the present case.

Of the non-Wisconsin authorities cited to us, the most pertinent are: Woodrich Construction Co. v. Indemnity Ins. Co., 252 Minn. 86, 89 N.W.2d 412 (1958), and Liberty Mutual Insurance Company v. Steenberg Construction Co., 225 F.2d 294 (C.A.8th, 1955), cited by Eagle Picher; and Great American Insurance Co. v. General Acc. Fire & Life Assur. Corp., 321 F.2d 948 (C.A.5th, 1963), and Ford

Motor Co. v. Continental Cas. Co., 6 Ohio St.2d 114, 216 N.E.2d 44 (1966), cited by Hardware.

*Woodrich* involved a general contractor (Woodrich) constructing a concrete pavement, a subcontractor (Baker), a trucker (Zaske) hired by Baker, and a state road construction inspector (Crawford). Zaske brought his truck into a congested area at the jobsite. An employee of Woodrich undertook to direct Zaske to back up Zaske's truck. Zaske followed the direction, and the truck struck Crawford. Crawford obtained a judgment against Woodrich. Woodrich then sought to hold its own automobile liability insurer, which then looked to Baker's and Zaske's automobile liability insurers; although different provisions of the three policies were involved, all three situations required a finding that Woodrich was using or was not using the Zaske truck. The court held that Woodrich was a user of the Zaske truck, even though it did not own the truck and none of its agents was operating the truck. The decision turned, however, upon "the broader concept of employing or putting the vehicle into one's service by an act which assumes at any time—with the consent of the owner or his agent—the supervisory control or guidance of its movement." 252 Minn. at 93, 89 N.W.2d at 418. In the present case, as we have seen, there is a genuine issue as to whether Eagle Picher had assumed the supervisory control or guidance of the Gensler truck driven by plaintiff Hake.

In Liberty Mutual Ins. Co. v. Steenberg Construction Co., 225 F.2d 294, 295 (C.A. 8th, 1955):

"A general contractor * * * assumed to direct the movements of a subcontractor's truck, making delivery of mixed concrete for the general contractor's use in laying a floor, by supervising and signalling, from the rear of the truck, the course to be taken by the driver on the premises, in backing the truck to the spot where the general contractor desired to have the concrete dumped. The supervising, signalling and backing operations, so being carried on, resulted in the truck occasioning personal injury to a third party, not an employee of either the general contractor or the subcontractor."

The injured party sued both the general contractor and the subcontractor and obtained judgment against them jointly. The general contractor then sought indemnity from the automobile liability insurer of the subcontractor's truck, claiming the status of an additional insured as a "person while using the [truck]." The court held that the general contractor was a user of the truck, emphasizing that the general contractor's "active directing" of the movements of the truck "made the participation of the general contractor such an immediate part of the actual operating of the truck as to constitute the general contractor, in a sufficient legal sense, a person 'using the automobile' * * *." 225 F.2d at 296. In the present case no such "active directing" of Hake and the Gensler truck is established beyond genuine dispute.

In both Great American Insurance Co. v. General Acc. Fire & Life Assur. Corp., 321 F.2d 948 (C.A.5th, 1963), and Ford Motor Co. v. Continental Cas. Co., 6 Ohio St.2d 114, 216 N.E.2d 44 (1966), cited here by Hardware, status as an additional insured under an automobile liability policy was denied to a party whose position was somewhat comparable to that of Eagle Picher here. In *Great American,* a power company had hired a proprietorship called "Trees" to transplant a tree situated under a power line of the power company. Trees used its own truck and equipment and its own personnel and appears to have been in charge of the details of the project. Trees' employee, injured when the tree struck the power line during the transplanting, obtained a judgment against the power company, which sought indemnity from the automobile liability insurer of Trees. The court held that the power company was not "using" the truck and thus was not an additional insured. In *Ford Motor,* a truck owned by one Clifton and oper-

ated by a Clifton employee came upon Ford property to pick up cinders purchased by Clifton from Ford. The Clifton employee loaded the truck by means of a chute device, moved the truck out of the chute area, and, without having shut off the loading device, went back to shovel the spillage into the truck. He was struck and injured by a chunk of frozen cinders falling down the chute. Ford was denied the protection of Clifton's automobile liability policy. The court held that Ford was not using the truck.

Eagle Picher here seeks to distinguish *Great American* on the ground that: "The whole operation was handled by Trees. No one with the power company was at the spot or involved otherwise." (Eagle Picher reply brief, p. 4.) It seeks to distinguish *Ford* on the ground that: " * * * the court recognized that none of Ford's employees were in any way involved in the operation in question." (Eagle Picher reply brief, p. 5.)

It is true that the presence of Tony Graham, Eagle Picher's employee, at the scene of the project in the present case and his participation in synchronized maneuvers with the Gensler trucks and employees are elements missing in *Great American* and in *Ford*. But they are elements which also fall short of the "active directing" which was present in *Woodrich* and in *Liberty Mutual*.

■ The ultimate question is whether the coverage sought may fairly be held to fall within the reasonable expectations of the parties to the automobile liability insurance contract issued by Hardware to Gensler. In the absence of clearer authority than that cited to the court, the court is unable so to hold, and will deny Eagle Picher's motion for summary judgment.

It is a curious circumstance that plaintiff, who has opposed Eagle Picher's mo-

tion for summary judgment against Hardware, has alleged in his amended complaint "that the method of raising said dam adopted and directed by [Eagle Picher] was to have the truck driven by plaintiff loaded on [Eagle Picher's] premises near said dam and to require that the truck be backed along the top of the dam * * *"; and has further alleged negligence on the part of Eagle Picher in that it "permitted and directed the transportation of the dirt to raise the dam onto the top of the dam by truck and provided no way for the truck to move on to the dam except by backing." Also, in taking depositions, plaintiff's counsel has sought to elicit testimony to the effect that Eagle Picher's direction and supervision of the plaintiff and the Gensler trucks was active.

Eagle Picher, on the other hand, although the movant for summary judgment against Hardware, denies by its answer to the amended complaint that it "directed either the method or manner in which plaintiff operated his truck," denies that it had or exercised any control as to the specific manner in which plaintiff operated his truck, and alleges that plaintiff was "subject to the direction and control of Gensler Bros., who were independent contractors * * *." Also, in their depositions, Eagle Picher's representatives were at pains to deny the existence of direction or supervision on their part, or to minimize it.

Thus, it may be that the final resolution of the issue of Eagle Picher's liability to plaintiff Hake will require factual determinations upon which Hardware's liability to Eagle Picher will also turn. For the present, the court holds only that the undisputed facts do not entitle Eagle Picher to summary judgment against Hardware.

For the reasons stated, the motion by Eagle Picher for summary judgment against Hardware is hereby denied.